# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 6618 | **DATE** | 1/10/2005 |
| **CASE TITLE** | | Woods vs. Clay, et al. | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____. Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]  Enter Memorandum Opinion and Order. For the reasons stated in the Memorandum Opinion and Order, Plaintiff Toi Woods' Motion [102] for Partial Summary Judgment is denied. City of Harvey Defendants' Motion [98] for Partial Summary Judgment is granted with regard to count II as to City of Harvey; count IV, count V, count VI, and VIII as to Sergeant Perry; Toi Woods' claims in count VI as to Officer Clay; count VII as to Sergeant Perry, Officer Williams, and Officer Richmond; count VIII as to Sergeant Perry, Officers Clay, Williams, Richmond, and the City of Harvey. City of Harvey Defendant's Motion [98] for Partial Summary Judgment is denied as to count I; counts IV, and V as to Officers Clay, Williams, and Richmond; count VI as to Officers Richmond and Williams; and count IX. Fifty Yard Line's Motion [101] for Summary Judgment as to count III is denied.

(11)  ■  [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | **4** number of notices |
| ✓ | Notices mailed by judge's staff. | **DEC 1 1 2005** date docketed |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | docketing deputy initials |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | **1/10/2005** date mailed notice |
| MD | courtroom deputy's initials | MD mailing deputy initials |

Document Number

**163**

Date/time received in central Clerk's Office

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JAMES W. WOODS and TOI WOODS,    )
            )
          **Plaintiffs,**    )
            )
        **vs.**       )
            )
DAVID CLAY, in both his individual and   )     No. 01 C 6618
official capacities; OSCAR FERRY, in both  )
his individual and official capacities;      )     Judge Joan H. Lefkow
ERIC PRINCE, in both his individual and   )     Magistrate Judge Ashman
official capacities; KEVIN RICHMOND, in  )
both his individual and official capacities;  )
JAMES McGEE, in both his individual and  )
official capacities; RAMONE WILLIAMS,  )
in both his individual and official capacities; )
CITY OF HARVEY, ILLINOIS, a municipal  )
corporation; and 50 EXPRESS, INC.,     )
d/b/a/ THE FIFTY YARD LINE        )
SPORTS BAR AND GRILL,        )
            )
         **Defendants.**    )

CORRECTED

JAN 1 1 2005

## MEMORANDUM OPINION AND ORDER

Plaintiffs, James W. Woods and Toi Woods, filed a ten count complaint against defendants

David Clay ("Officer Clay"), Oscar Perry ("Sergeant Perry"), Eric Prince ("Officer Prince"),[1] Kevin

Richmond ("Officer Richmond"), James McGee ("Officer McGee"),[2] Ramone Williams ("Officer

Williams")(collectively, "Harvey Police Officers"), the City of Harvey (the "City"), and 50 Express,

Inc. d/b/a The Fifty Yard Line Sports Bar and Grill (the "Fifty Yard Line"), pursuant to 42 U.S.C.

---

[1] This court previously entered a default judgment against Officer Prince on counts One, Four, Five, Six, Seven, Eight, and Nine of Plaintiffs' Second Amended Complaint. As a consequence, Officer Prince is not a subject of the pending motions.

[2] This court previously entered a default judgment against Officer McGee on counts One, Four, Five, Six, Seven, Eight, and Nine of Plaintiffs' Second Amended Complaint. As a consequence, Officer McGee is not a subject of the pending motions.

163

§ 1983. Count I is against Officers Clay, Prince, Richmond, McGee, Williams, and Sergeant Perry for the arrest and imprisonment of plaintiffs without probable cause in violation of § 1983; count II is against the City and alleges that the conduct of the Harvey Police Officers was undertaken pursuant to the policy, custom and/or practice of the City in violation of § 1983; count III alleges that the Fifty Yard Line is responsible for the conduct of the Harvey Police Officers because it acted under color of state law by engaging in a joint action with the City in the arrest of plaintiffs in violation of § 1983; counts IV (false arrest), V (false imprisonment), VI (battery), VII (malicious prosecution), VIII (intentional infliction of emotional distress), and IX (violation of the Illinois Constitution) allege state law claims against all of the defendants; and count X seeks indemnification from the City in the event that judgement is entered against Sergeant Perry and Officers Prince, Richmond, and Williams. Before the court are the City of Harvey defendants' motion for partial summary judgment, Toi Woods' motion for partial summary judgment, and the Fifty Yard Line's motion for summary judgment. This court has jurisdiction pursuant to 28 U.S.C. §§ 1343 and 1367. For the reasons stated below, the court denies Toi Woods' motion for partial summary judgment; the court grants in part and denies in part the City of Harvey defendants' motion for partial summary judgment; and the court denies the Fifty Yard Line's motion for summary judgment.

## FACTS

### I.      Undisputed Facts

Plaintiffs James Woods ("Mr. Woods") and Toi Woods ("Mrs. Woods") are residents of Cook County, Illinois and are married to each other. Mr. Woods is a police officer for the City of Chicago. On the night of November 18, 2000, Mr. and Mrs. Woods arrived at the Fifty Yard Line, which is located in Harvey, Illinois, between 10:30 and 10:45 P.M. to attend a birthday party for their

friend, Alicia Miller ("Miller"). Mrs. Woods was initially hesitant about attending the party because the club had a "history" and a "reputation." (Pls' Resp. to the City of Harvey Defs' L.R. 56.1 Add'l Facts at ¶ 1). Apparently, some of the Fifty Yard Line's clientele do not possess particularly peaceful dispositions. Fights commonly break out in the parking lot when the Fifty Yard Line closes. Assaults, batteries, and murders also have occurred at the Fifty Yard Line. Because Miller's party was held in a private room at the Fifty Yard Line, however, Mrs. Woods agreed to attend. Mr. Woods, although off-duty, carried his service weapon with him into the Fifty Yard Line and consumed at least one alcoholic beverage.

Officer Clay, Officer McGee, and Deputy Marshall Joyce Jones ("Jones"),[3] were working as security personnel for the Fifty Yard Line that night. In that capacity, Officer Clay, Officer McGee, and Deputy Marshall Jones checked the identification of the Fifty Yard Line's patrons, searched for weapons, conducted "pat-downs," and worked the Fifty Yard Line's hallway. The Fifty Yard Line paid Officer Clay, Officer McGee, and Deputy Marshall Jones for their services. The City also employed Officer Clay, Officer McGee, and Deputy Marshall Jones. These officers learned of the employment opportunities at the Fifty Yard Line by word of mouth from other City police officers and from employees of the Fifty Yard Line. While working security at the Fifty Yard Line, the officers reported to the Fifty Yard Line's managers. In addition, the City employed Sergeant Perry, Officer Williams, and Officer Richmond, each of whom were on-duty that night.

Although the Fifty Yard Line did not specify the type of clothing to be worn by Officer Clay, Officer McGee, and Deputy Marshall Jones, the officers usually wore black "tactical" outfits with

---

[3]Deputy Marshall Joyce Jones is not a defendant in this action. Any reference to defendants or the Harvey Police Officers does not refer to or include Jones.

caps that read "Police." On the evening in question, Officers Clay and Deputy Marshall Jones were dressed in black "tactical" outfits. In addition, Officer Clay wore his police badge on his vest, Officer McGee wore his police badge around his neck, and Deputy Marshall Jones wore her police badge on her vest. Officer Clay also wore his duty belt, consisting of his gun, handcuffs, and radio; Deputy Marshall Jones carried her handcuffs, Harvey Police Department service revolver, and asp (steel baton); and Officer McGee carried his Harvey Police Department service revolver. The Harvey Police Department required its personnel to carry their guns while working. In addition to the police officers, the Fifty Yard Line employed non-police officers to work security. These individuals were required to wear black pants and red t-shirts with the Fifty Yard Line's name on the back and "Security" on the front.

At some point after Mr. and Mrs. Woods arrived at the Fifty Yard Line, a Fifty Yard Line security guard escorted Miller's husband and brother-in-law from the premises after they had engaged in a loud argument. Mr. and Mrs. Woods left the Fifty Yard Line about two minutes later. Mr. Woods, however, returned to the Fifty Yard Line to assist Miller in collecting her belongings while Mrs. Woods stayed outside. Approximately fifteen minutes passed before Mrs. Woods reentered the Fifty Yard Line and found Mr. Woods laying face down on the floor. A police officer had his knee in Mr. Woods' back and was in the process of handcuffing Mr. Woods.

Officer Richmond arrived at the Fifty Yard Line and discovered a crowd gathered around Mr. Woods, who was handcuffed and lying on the floor. Mrs. Woods was subsequently arrested for disorderly conduct. Officer Richmond did not hear Mrs. Woods say anything while at the Fifty Yard Line. Although the Fifty Yard Line's manager, Zach Basingame, was standing in the front lobby at

that time, he did not attempt to interfere in the events leading up to the arrests or in the arrests themselves.

Officer Prince completed an incident report, which Sergeant Perry signed. The incident report stated that Mr. Woods stepped in between Officer Clay and the unknown subject preventing Officer Clay from removing the unknown subject from the club. (Pl.'s L.R. 56.1, Ex. G at 1). The incident report continued: "The suspect was told several times to step back in which the suspect refused. The suspect became irate telling thats [*sic*] my friend" and continued to stand between Officer Clay and the unknown subject. *Id.* With regard to Mrs. Woods, the incident report stated that she ran up to Clay "yelling and screaming 'That's my husband! Let him go.' At which time a crowd gathered. Suspect #2 was taken into custody." (Pl.'s L.R. 56.1, Ex. G at 2). Sergeant Perry did not conduct an investigation or interview the crowd at the Fifty Yard Line but he spoke with Officer Clay at the scene.

Mr. and Mrs. Woods were transported to the Harvey Police Department in separate cars. They arrived in booking at 2:55 a.m. Mr. Woods was allowed to make two telephone calls and to receive a call from a lawyer within forty-five minutes of his arrival. Within an hour, Mr. Woods was charged with obstructing a peace officer and disorderly conduct. Officer Clay signed the complaint against Mr. Woods, which stated that Mr. Woods

> KNOWINGLY ACTED IN SUCH AN UNREASONABLE MANNER AS TO ALARM OR TO DISTURB ANOTHER AND TO PROVOKE A BREACH OF THE PEACE TO WIT: THE DEFENDANT BECAME IRATE, YELLING "THAT IS MY FRIEND" AND WHICH HE STOOD OFC. CLAY #15 AND THE UNKNOWN OFFENDERS WHO WERE BEING PUT OUT.

(Pl. Add'l Facts in Resp. to Fifty Yard Line's L.R. 56.1, Ex. A.). The complaint further stated that

SAID DEFENDANT KNOWINGLY OBSTRUCTED THE PERFORMANCE OF OFC. CLAY #15 OF AN AUTHORIZED ACT WITHIN HIS OFFICIAL CAPACITY, BEING THE ARREST OF JAMES WOODS, KNOWING OF OFC. CLAY #15 TO BE A PEACE OFFICER ENGAGED IN THE EXECUTION OF HIS OFFICIAL DUTIES, IN THAT THE DEFENDANT STEPPED IN BETWEEN OFC. CLAY #15 AND UNKNOWN SUBJECT WAY AFTER BEING TOLD SEVERAL TIMES TO STEP BACK IN WHICH JAMES WOODS REFUSED.

*Id.* Officer Clay signed the complaint as "OFC. CLAY #15. *Id.*

Officer Clay also signed a complaint against Mrs. Woods, which stated that Mrs. Woods "KNOWINGLY ACTED IN SUCH AN UNREASONABLE MANNER AS TO ALARM OR DISTURB ANOTHER AND TO PROVOKE A BREACH OF THE PEACE, TO WIT: THE DEFENDANT RAN UP TO OFC CLAY, YELLING AND SCREAMING 'THAT'S MY HUSBAND! LET HIM GO', CAUSING A CROWD TO GATHER." *Id.* Officer Clay signed the complaint against Mrs. Woods as "OFC. Clay #15." *Id.*

Mr. and Mrs. Woods were held in jail for approximately eight hours before being released. On December 5, 2000, one of the charge against Mr. Woods was stricken off the call with leave to reinstate (SOL'd) and the other charge was terminated with a *nolle prosequi* when no complaining witnesses appeared at the court hearing on December 5, 2000.[4] On December 28, 2000, a *nolle prosequi* was entered terminating the charge of disorderly conduct against Mrs. Woods when no complaining witnesses appeared at her court hearing.

---

[4] The formal explanation for this action, *"nolle prosequi,"* is the bringing of a motion before a judge on the part of a prosecutor to "voluntarily withdraw[] . . . [all] proceedings on a criminal charge."*Anderer v. Jones* 385 F.3d 1043 at 1061 n. 8 (7th Cir. 2003)(*quoting* BLACK'S LAW DICTIONARY (6th Ed.).

## II.    Disputed Facts

The parties dispute most of what occurred on the night of November 18 and early morning of November 19, 2000. Each provides a different version of the triggering events and the behavior of the parties during those events. The court reminds the parties that "summary judgment cannot be used to resolve swearing contests between litigants." *Payne* v. *Pauley*, 337 F.3d 767 at 770 (7ᵗʰ Cir. 2003)(citations omitted). Rather, "[o]n summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a fact finder." *Id.* at 770 (citations omitted). "[T]he court has one task and one task only: to decide based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* (quoting *Waldridge* v. *Am. Hoescht Corp.*, 24 F.3d 918, 920 (7ᵗʰ Cir. 1994).

To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242,

255 (1986). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)). Instead, the court must consider the evidence as a jury might, "construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true." *Id.* (citing *Shepherd* v. *Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999).

A.    *Plaintiffs' Version of the Confrontation Between Mr. Woods and the Harvey Police Officers*

In plaintiffs' version of events, Miller asked Deputy Marshall Jones if she could reenter the Fifty Yard Line to retrieve her belongings, and Deputy Marshall Jones said no. (Pls' Resp. to City of Harvey Defs' L.R. 56.1 Add'l Facts at ¶ 6). Miller asked Deputy Marshall Jones who she was, and Deputy Marshall Jones informed Miller that she was with the Harvey Police. *Id.* Although Miller was calm, Deputy Marshall Jones swore at her and then struck her. *Id.* Mr. Woods was standing next to Miller after she was struck by Deputy Marshall Jones. *Id.* at ¶ 7. Mr. Woods instructed Miller that they should leave and grabbed Miller's arm in order to prevent the situation from escalating. *Id.* at ¶ 8. Mr. Woods did not make a move toward Deputy Marshall Jones. *Id.* Fifty Yard Line security then backed Mr. Woods against the wall. *Id.* In response, Mr. Woods displayed his Chicago Police Department badge and said that he was trying to break up a fight. *Id.* Fifty Yard Line security responded, "You Chicago cops think you're the sh__t." *Id.* Two uniformed police officers for the City, Officers Richmond and Williams, entered the Fifty Yard Line while Mr. Woods was displaying his badge as he was backed against the wall. *Id.* One of the uniformed officers began to handcuff Mr. Woods' left arm while he was backed against the wall. *Id.* At that

point, Officer Clay came up and tackled Mr. Woods, taking him to the ground. *Id.* Officers Williams, Richmond, and McGee assisted Officer Clay in restraining Mr. Woods. *Id.* Officers Clay and McGee then escorted Mr. Woods outside. *Id.*

### B. City of Harvey Defendants' Version of the Confrontation Between Mr. Woods and the Harvey Police

In the Harvey Police Officers' version of events, Miller became involved in a heated confrontation with Deputy Marshall Jones while Mr. Woods was standing with or near Miller. (Defs' L.R. 56.1 at ¶ 9). Officer Clay was within the sight of the confrontation. *Id.* at ¶ 10. Officer Clay claims to have observed what he thought was Mr. Woods moving to strike Deputy Marshall Jones. *Id.* at ¶ 11. Officer Clay then took Mr. Woods to the ground and placed him under arrest. *Id.*

### C. Plaintiffs' Version of Mrs. Woods' Arrest

The parties also dispute the events surrounding Mrs. Woods' arrest. Plaintiffs contend that Mrs. Woods said, "That's my husband, he's a Chicago cop, let him go," upon discovering her husband laying on the floor while being handcuffed. (Pls' Resp. to City of Harvey Defs' Add'l Facts at ¶ 10). In plaintiffs' version of events, Mrs. Woods was then arrested and handcuffed at which time she said, "He's a cop. What's going on, what's happening?" *Id.* She then heard, "Well, nigger, this ain't Chicago. You Chicago cops think you're the sh_t." *Id.* She also heard, "Well, your ass can go too." (Pl.'s L.R. 56.1 at ¶ 17). Her hands were grabbed, placed behind her back, and handcuffed. *Id.* As Mr. Woods and Mrs. Woods were escorted from the Fifty Yard Line, Mrs. Woods asked Fifty Yard Line security, "Why would you be arresting him for breaking up a fight?

He's a Chicago police officer." *Id.* She subsequently heard the response, "Well, this ain't Chicago, punk." (Pls' Resp. to City of Harvey Defs' L.R. 56.1 Add'l Facts at ¶ 10).

### D. City of Harvey Defendants' Version of Mrs. Woods' Arrest

In defendants' version of events, Mrs. Woods stated, "He's the deuce; he's with Chicago Police." (City of Harvey Defs' Resp. to Pl.'s L.R. 56.1 at ¶ 16). As Officers Clay and McGee escorted Mr. Woods from the Fifty Yard Line, Mrs. Woods went in front of the officers and put herself in between Officer McGee and Mr. Woods. *Id.* She was grabbing at Mr. Woods. *Id.* at ¶17. After Officer Clay told Mrs. Woods to back off and to stop interfering, she continued to yell, scream and cuss. *Id.* Defendants also expressly dispute that anyone said, "Well, your ass can go too." *Id.* The parties also disagree as to whether Mrs. Woods was immediately handcuffed upon stating that her husband was with the Chicago Police or whether Mrs. Woods was yelling, screaming, cussing, and grabbing at her husband after being told to step back by Officer Clay. Further, the parties dispute the extent of alleged damages suffered by plaintiffs.

### E. Additional Disputed Facts

The parties also dispute whether Officers Richmond and Williams were involved in Mrs. Woods' arrest. Defendants contend that upon arriving at the Fifty Yard Line, Officer Richmond did not see Mrs. Woods and then proceeded to step outside for a minute or two. Upon reentering the Fifty Yard Line, Officer Richmond found Mrs. Woods handcuffed and silent. Mr. and Mrs. Woods, by contrast, maintain that two uniformed police officers were helping Mr. Woods to his feet when one of the two uniformed officers said, "Well, your ass can go, too." At that point, one of the uniformed officers grabbed Mrs. Woods' hands, placed them behind her back, and handcuffed them. Both Officer Richmond and Officer Williams were wearing uniforms.

10

In addition, the parties dispute whether Officer Clay, Officer McGee, and Deputy Marshall Jones were "on-duty" or "off-duty" while working for the Fifty Yard Line. Although the parties agree that the Fifty Yard Line, and not the City, paid Officer Clay, Officer McGee, and Deputy Marshall Jones for their services as security personnel at the Fifty Yard Line, plaintiffs contend that Officer Clay, Officer McGee, and Deputy Marshall Jones remained "on-duty" while defendants argue that they were "off-duty." Officer Clay testified at his deposition that the Harvey Police Department has "a policy stating that when you are off duty - - when you're off duty, you are still on, and you're still a policeman." (Pls' Resp. to Fifty Yard Line's L.R. 56.1, Ex. F, P. 26, lines 15-20). On the night in question, Deputy Marshall Jones identified herself as "Harvey police." (Pls' Resp. to Fifty Yard Line's L.R. 56.1, Ex. L at 36, lines 21-24, at 37, lines 1-5). In addition, former Chief of Police Philip Hardiman testified at deposition that an officer is not precluded from acting in the capacity as a police officer when he is off-duty. (Pls' Resp. to Fifty Yard Line's L.R. 56.1, Ex. K at 28, lines 8-11).

The parties also dispute whether the Fifty Yard Line had a security policy and whether it trained the police officers who worked security at the Fifty Yard Line. The Fifty Yard Line claims that it maintained a security policy in which its security personnel were instructed to not put their hands on patrons causing a problem; instead, security was supposed to talk the patron out of the building. Plaintiffs, however, contend that the Fifty Yard Line had no safety precautions in place, that there were no written policies, and that the Fifty Yard Line's security personnel did, in fact, physically put their hands on Officer Woods on the night in question. Plaintiffs further argue that the Fifty Yard Line gave directions and instructions to the officers hired to work security as to their obligations when working security, including checking identification, searching patrons, patting

11

down patrons, telling them to leave the club if they smelled alcohol and who to allow into the Fifty Yard Line. The parties also dispute the level of involvement and various roles of the police officers in arresting plaintiffs.

Moreover, the parties dispute whether the conduct of plaintiffs caused a crowd to gather. In particular, the Harvey Police Officers contend that there were no patrons outside before Officers Clay and McGee brought Mr. Woods out of the Fifty Yard Line. Patrons began to emerge from the club as Mr. Woods was escorted outside. About a minute after they were outside, Mrs. Woods started a "commotion" (City of Harvey Defs' Response to Pl.'s L.R. 56.1 at ¶ 22), by yelling, screaming, cussing, and grabbing at her husband. (City of Harvey Defs' L.R. 56.1 Add'l Facts at ¶ 10). Mrs. Woods, by contrast, contends that the crowd was already gathered when she spoke to the police. (Pl.'s L.R. 56.1 at ¶ 15).

## ANALYSIS

Notwithstanding the differing versions of events, all of the parties have filed motions for summary judgment and/or partial summary judgment. The court addresses each party's motion in turn.

### I.     Plaintiff Toi Woods' Motion for Partial Summary Judgment

#### A.     Count I - § 1983

In order to prevail on their claim of unlawful arrest under § 1983, plaintiffs must establish the absence of probable cause for their arrests. *See Kelley* v. *Myler*, 149 F.3d 641, 646 (7th Cir. 1998). In count I, plaintiffs allege that they were arrested without probable cause and seek relief against Sergeant Perry and Officers Clay, Prince, Richmond, McGee and Williams under 42 U.S.C.

§ 1983. Mrs. Woods filed a motion for partial summary judgment against the Harvey Police Officers with regard to Count I of the Second Amended Complaint.

The primary argument raised by Mrs. Woods is that the Harvey Police Officers lacked probable cause to arrest her as a matter of law because no reasonable police officer could have believed that she was guilty of disorderly conduct. She contends that upon seeing her husband held to the ground with a knee in his back and his arms about to be hand-cuffed she stated, "That's my husband. He's a police officer. Let him go." (Pl. L.R. 56.1 at ¶ 16).

Probable cause to arrest a suspect exists "if at the time of arrest the facts and circumstances within the arresting officer's knowledge and of which [he] has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense." *Gower* v. *Vercler*, 377 F.3d 661 at 668 (7th Cir. 2004), quoting *Spiegel* v. *Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). "Probable cause demands even less than probability; it requires more than bare suspicion but need not be based on evidence sufficient to support a conviction nor even a showing that the officer's belief is more likely true than false." *Woods* v. *City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000)(internal quotations and citations omitted). This is necessarily a fact-intensive inquiry. *Jones by Jones* v. *Webb*, 45 F.3d 178 at 180 (7th Cir. 1995). As a consequence, summary judgment is inappropriate where material facts regarding the existence of probable cause are in dispute. *See Morfin* v. *City of Chicago*, 349 F.3d 989 at 1000 (7th Cir. 2003)("Where there is a genuine issue of material fact surrounding the question of plaintiff's conduct, the court cannot determine, as a matter of law, what predicate facts exist to decide whether or not the officer's conduct clearly violated established law.")(citation omitted). *See also Schertz* v. *Waupauca County*, 875 F.3d 578 at 582 (7th Cir. 1989)("While Section 1983 claims presenting

13

the question of probable cause are generally inappropriate for disposition on summary judgment, this is true only where there is room for a difference of opinion.").

Under Illinois law, a person commits the misdemeanor of disorderly conduct if "he knowingly: (1) Does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS 5/26-1(a)(1). The Seventh Circuit has noted that "the emphasis of the statute is upon the tendency of the conduct to disturb others and to provoke disruptions of public order upon the unreasonableness of the activity when viewed in the context of the surrounding circumstances." *Gower*, 377 F.3d at 670 (citations omitted).

In support of her motion for summary judgment as to count I, Mrs. Woods relies upon a number of cases in which courts have held that arguing with a police officer, even when arguing in a loud voice or using profanity or offensive language, does not constitute disorderly conduct. *See Payne*, 337 F.3d at 777 ("Illinois courts have time and again held that arguing with a police officer, even if done loudly, or with profane or offensive language, will not in and of itself constitute disorderly conduct."); *People v. Trester*, 96 9 Ill. App. 3d 553, 421 N.E.2d 959 at 960, 52 Ill. Dec. 96 (Ill. App. Ct. 1981); *People v. Justus*, 57 Ill. App. 3d 164, 372 N.E.2d 1115, 1117, 14 Ill. Dec. 836 (Ill. App. Ct. 1978).

Defendants, however, allege that Mrs. Woods did more than yell, scream, and cuss at them; they allege that she positioned herself in front of the officers arresting Mr. Woods while grabbing at Mr. Woods. Mrs. Woods likens the facts as alleged by defendants to the scenario presented in *Justus* in which the Appellate Court of Illinois reversed the decision of the circuit court following a bench trial. *Justus*, 372 N.E.2d at 1118. The circuit court had convicted the defendant of disorderly conduct under the Municipal Code of the City of Chicago as a result of the defendant's

screaming and yelling hysterically at a police officer for writing her a parking ticket. *Id.* at 1117. After the officer finished writing the ticket, the defendant followed him back to his squad car whereupon she grabbed at the pen in his pocket. *Id.* Because the only reference to a public disorder was the officer's testimony that a crowd had gathered in the area, the appellate court determined that there was no proof that the defendant's actions caused a public disorder. *Id.*

The present situation, as alleged by defendants, is readily distinguishable from *Justus*. While the parties in both the instant matter and in *Justus* provide differing versions of events, the instant matter is only at the summary judgment stage while *Justus* involved a decision on the merits regarding whether the defendant was guilty of disorderly conduct. At this point in the present matter, the court and parties are concerned with whether the Harvey Police Officers had probable cause to arrest Mrs. Woods, not whether she was guilty of disorderly conduct. In addition, according to defendants' version of events, Mrs. Woods did far more than yell and scream and grab at a pen. The defendants allege that Mrs. Woods, while yelling, screaming, and cussing, placed herself in between an arresting police officer and a suspect who was found carrying a concealed weapon in a club known for having a rather volatile clientele. Defendants further allege that she was grabbing at the suspect. Obviously, such a scenario presents different considerations for the arresting officers from those presented by a person grabbing for a pen. In addition, even though Officer Clay considered Mrs. Woods' actions to be those of a normal wife who was concerned about her husband, *see* Pl. L.R. 56.1, Ex. J at 109, a genuine issue of material fact exist with regard to whether the Harvey Police Officers had probable cause to arrest Mrs. Woods for disorderly conduct, as evidenced by the differing versions of the incident provided by the parties. Thus, the court denies Mrs. Woods' motion for summary judgment as to count I.

15

Because genuine issues of material fact exist with regard to the existence of probable cause to arrest Mrs. Woods, the court also denies Mrs. Woods' motion for summary judgment as to count IV (false arrest), count V (false imprisonment), count VII (malicious prosecution), and count IX (violation of the Illinois Constitution) as against the Harvey Police Officers. *See Schertz*, 875 F.2d at 582 ("[T]he existence of probable cause for arrest is an absolute bar to a Section 1983 claim for unlawful arrest, false imprisonment, or malicious prosecution.")(citations omitted).

### B.    *Plaintiff Toi Woods' Claims Against the Fifty Yard Line*[5]

The Fifty Yard Line failed to respond or in any way controvert any of the statements contained Mrs. Woods' Local Rule 56.1 Statement of Facts. As a consequence, all of the material facts contained therein are deemed admitted as against the Fifty Yard Line. *See* L.R. 56.1(b)(3)(A) and (B). *See also Bordelon* v. *Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7ᵗʰ Cir. 2000); *Dimmitt & Owens Fin.* v. *Superior Sports Prods., Inc.*, 196 F. Supp. 2d 731, 736 (N.D. Ill. 2002). Nevertheless, the Fifty Yard Line's failure to comply with Local Rule 56.1 does not mean that summary judgment will automatically be granted in favor of Mrs. Woods. The court still must evaluate all facts in the light most favorable to the Fifty Yard Line, the non-moving party. *See Austin-Edwards* v. *Loyola Univ. Med. Ctr.*, 2004 U.S. Dist. LEXIS 10126, *6 (N.D. Ill. June 3, 2004).

Mrs. Woods' Statement of Facts established that Officer Clay was a duly appointed police officer for the City and also worked as a security guard for the Fifty Yard Line during the time relevant to the lawsuit. (Pl.'s L.R. 56.1 at ¶ 4). In addition, security guards for the Fifty Yard Line

---

[5]Mrs. Woods moved for summary judgment against the Fifty Yard Line with regard to count I of the Second Amended Complaint. This count, however, does not seek relief against the Fifty Yard Line.

were present when a uniformed police officer was in the process of handcuffing Officer Woods. *Id.* at ¶ 15. Officer Clay signed the misdemeanor complaint against Mrs. Woods. *Id.* at ¶ 21.

The Statement of Facts, however, did not contain any material facts establishing that Officer Clay or any other individual involved in Mrs. Woods' arrest was acting as the agent, servant, or employee of the Fifty Yard Line or acting within the scope of his employment at the time of Mrs. Woods' arrest. In her supplemental reply brief, Mrs. Woods attempts to stretch the facts as set forth in her Statement of Facts to cover the Fifty Yard Line's alleged vicarious liability. *See* Pl.'s Supplemental Reply Brief In Support of Motion for Summary Judgment at 2 ("Clay was a Harvey Police officer who was acting as both a Fifty Yard Line security guard and in his official capacity as a Harvey police officer as he participated in the arrests of James and Toi Woods."). The evidence on which Mrs. Woods relied in support of this statement was the admission of the City of Harvey Defendants' Answer to Plaintiffs' Second Amended Complaint. In their answer, the City of Harvey Defendants admitted that Officers Clay and McGee were duly sworn and appointed police officers for the City of Harvey and also worked as security guards for the Fifty Yard Line at all relevant times to this lawsuit. (Pl's L.R. 56.1, Ex. B1 and B2 at ¶3. Notably, neither the admission of the City of Harvey defendants nor Mrs. Woods' Statement of Facts established that Officer Clay was acting as both a security guard for the Fifty Yard Line and in his official capacity as a Harvey police officer when participating in the arrests of Mr. and Mrs. Woods.

In her Statement of Material Facts, Mrs. Woods failed to include any material facts establishing what Officer Clay's duties as a security guard for the Fifty Yard Line consisted of. Mrs. Woods also did not present any material facts specifically establishing that Officer Clay acted as both a police officer and as a security guard while participating in the arrest of Mrs. Woods. Mrs. Woods

implicitly acknowledges these deficiencies in her Statement of Material Facts by referring the court

to the exhibits attached to her Statement of Facts rather than to the facts themselves. *See* Plaintiff's

Supplemental Reply Brief In Support of Motion for Summary Judgment at 4. Without material facts

demonstrating that Officer Clay was acting within the scope of his employment with the Fifty Yard

Line while participating in the arrest of Mrs. Woods, it is impossible for the court to conclude there

is no genuine issue of material fact with regard to the Fifty Yard Line's vicarious liability. The court,

therefore, denies summary judgment as to Mrs. Woods' state law claims against the Fifty Yard Line.

## II.    The Harvey Police Officers' Motion for Partial Summary Judgment

### A.    *Sergeant Perry*

Sergeant Perry has moved for partial summary judgment as to count I with regard to the

claims of Mr. and Mrs. Woods that they were arrested without probable cause in violation of § 1983.

Sergeant Perry contends that the extent of his involvement in the events surrounding the arrests of

Mr. and Mrs. Woods was limited to signing off on the incident report prepared by Officer Prince.

Plaintiffs contend, however, that Sergeant Perry is liable under § 1983 because he failed to intervene

in the deprivation of their constitutional rights. In support thereof, plaintiffs point to Sergeant

Perry's presence at the Fifty Yard Line while both plaintiffs were in handcuffs, his discussion with

Officer Clay at the scene, and his status as supervisor of the Harvey Police Officers.

An officer may be liable for failing to intervene or prevent another law enforcement officer

from infringing the constitutional rights of a citizen if the officer knows "(1) that excessive force was

being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation

has been committed by a law enforcement officer, *and* the officer had a realistic opportunity to

18

intervene to prevent the harm from occurring." *Yang* v. *Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (emphasis in original). This test applies equally to supervisory and nonsupervisory officers. *Id.* However, "[t]o be liable for the conduct of subordinates, a supervisor must be personally involved in that conduct. Supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable . . . . The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Morfin*, 349 F.3d at 1001 (citations omitted). Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all of the evidence, a reasonable jury could not possibly conclude otherwise. *Lanigan* v. *Village of E. Hazel Crest*, 110 F.3d 467 at 478 (7th Cir. 1997)(citation omitted).

Taking the facts in the light most favorable to plaintiffs and accepting that they were unlawfully arrested, the court finds a genuine issue of material fact exists as to whether Sergeant Perry had a realistic opportunity to intervene to prevent additional violations of plaintiffs' constitutional rights. Although both plaintiffs were arrested before Sergeant Perry arrived at the Fifty Yard Line, Sergeant Perry was advised of the bases for plaintiffs' arrests before they were transported to the police station. Sergeant Perry was not in a position to prevent plaintiffs from being arrested without probable cause, but he may have been in the position to prevent plaintiffs from being falsely imprisoned. Thus, the court denies summary judgment to the § 1983 claims of Mr. Woods and Mrs. Woods against Sergeant Perry.

Sergeant Perry also seeks summary judgment as to count IV (false arrest), count V (false imprisonment), and count VI (battery) as against Mr. Woods and Mrs. Woods. Sergeant Perry

argues that since he had no physical contact with either plaintiff and because he had no involvement in the arrest and/or restraint of either plaintiff, he cannot be held liable for these state law claims.

In order to state a claim of false arrest, the plaintiff must prove "a restraint or arrest, caused or procured by defendants, without their having reasonable grounds to believe an offense is being committed by plaintiff." *Karow* v. *Student Inns, Inc.*, 357 N.E.2d 682 at 686, 43 Ill. App. 3d 878, 2 Ill. Dec. 515 (Ill. App. Ct. 1976). As discussed above, Sergeant Perry arrived at the Fifty Yard Line after Mr. Woods and Mrs. Woods were placed under arrest, and, consequently, did not participate in the arrest of either plaintiff or cause or procure the arrest of either plaintiff. Therefore, summary judgment is granted in favor of Sergeant as to count IV.

With regard to count V, "false imprisonment consists of the unlawful restraint, against his will, of an individual's personal liberty or freedom of locomotion." *Id.* (citation omitted). In order to hold an individual liable for false imprisonment, "it must appear that he personally participated therein by direct act or indirect procurement. *Campbell* v. *Kaczmarek*, 350 N.E.2d 97 at 101, 39 Ill. App. 3d 465 (Ill. App. Ct. 1976)(citation omitted). "Not only will the officer making an illegal arrest be liable therefor, but any person who by making an affidavit to support an arrest warrant, or otherwise aids, advises, or abets the procurement of an arrest under a void process will also be liable in damages to the injured person. *Luker* v. *Nelson*, 341 F. Supp. 111 at 120 (N.D. Ill. 1972), citing *Develing* v. *Sheldon*, 83 Ill. 390 (Ill. 1876); *Gill* v. *Lewin*, 53 N.E.2d 336, 321 Ill. App. 633 (Ill. App. Ct. 1944). Moreover, "[e]ven when the arrest itself is perfectly valid and legally sustainable, an unlawful detention following the arrest can be in and of itself false imprisonment. *Id.* (citations omitted).

Officer Perry did not assist in the actual arrest of plaintiffs. He played no role in their subsequent transport to the police station or their confinement. Although Officer Perry supervised the arresting officers, under the Illinois Local Governmental and Local Governmental Tort Immunity Act (the "Act"), Sergeant Perry cannot be held liable in his capacity as supervisor for the acts of the other police officers. *See* 745 ILCS 10/2-204. The Act provides: "Except as otherwise provided by statute, a public employee, as such and acting within the scope of his employment, is not liable for an injury caused by the act or omission of another person." *Id.* Plaintiffs have not alleged or offered any evidence that Sergeant Perry was acting outside the scope of his employment, and, consequently, he cannot be held liable for the false imprisonment of plaintiffs committed by the other police officers. Thus, summary judgment is granted as to count V with regard to Officer Perry.

Similarly, plaintiffs cannot maintain their claim of battery against Sergeant Perry. In order to maintain a claim of battery, a plaintiff must establish that the defendant "intentionally and knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3. Here, there are no allegations that Sergeant Perry touched either Mr. Woods or Mrs. Woods in any manner. Sergeant Perry cannot be held liable in his capacity as the supervisor of the Harvey Police Officer for the battery committed by the other officers. *See* 745 ILCS 10/2-204. Since plaintiffs have not alleged or offered any evidence that Sergeant Perry was acting outside the scope of his employment, he cannot be held liable for the battery committed by the other police officers. Thus, summary judgment is granted in favor of Officer Perry as to count VI.

## B. Officers Clay, Williams, and Richmond

Officers Clay, Williams, and Richmond similarly seek summary judgment as to count I but only as to the claim of Mrs. Woods on the basis that they were not involved in the actual arrest of Mrs. Woods. As discussed above, however, "while it is true that a plaintiff must establish a defendant's personal responsibility for any claimed deprivation fo a constitutional right, a defendant's direct participation in the deprivation is not required." *Miller* v. *Smith*, 220 F.3d 491 at 495 (7th Cir. 2000), citing *Smith* v. *Rowe*, 761 F.2d 360, 369 (7th Cir. 1985). "An official satisfies the personal responsibility requirement of § 1983 if she acts *or fails to act* with a deliberate or reckless disregard of the plaintiff's constitutional rights." *Id.*, quoting *Crowder* v. *Lash*, 687 F.2d 996, 1005 (7th Cir. 1982)(emphasis in original). Thus, "police officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's rights . . . but fail to do so have been held liable." *Id.,* citing *Yang*, 37 F.3d at 285.

In the instant matter, Officers Clay, Williams, and Richmond were present at the Fifty Yard Line at the time of Mrs. Woods' arrest. Officer Clay was escorting Mr. Woods from the Fifty Yard Line when Mrs. Woods informed Officer Clay that Mr. Woods was her husband. This was the incident giving rise to Mrs. Woods' arrest, an incident which Officer Clay witnessed and then summarized in the misdemeanor complaint that he executed against Mrs. Woods. The Harvey Police Officers' attempt to analogize the actions of Officer Clay to those of the defendant in *Jenkins* v. *Keating*, 147 F.3d 577 (7th Cir. 1998), is unavailing. In *Jenkins*, the Seventh Circuit affirmed summary judgment in favor of the defendant police officer who merely signed the criminal complaint against the plaintiff. *Id.* at 583. In the present matter, however, Officer Clay's involvement in Mrs. Woods' arrest involved more than the ministerial task of signing the complaint; the very basis of the

complaint was Mrs. Woods' behavior toward Officers Clay and McGee. Taking the facts in the light most favorable to Mrs. Woods, Officer Clay would have recognized that the officers lacked probable cause to arrest Mrs. Woods for simply stating, "That's my husband. Let him go." Consequently, a genuine issue of material fact exists as to whether Officer Clay failed to act with a deliberate or reckless disregard of Mrs. Woods' constitutional rights.

In addition, while the parties dispute who actually placed Mrs. Woods under arrest, both Mr. and Mrs. Woods maintain that two uniformed police officers were helping Mr. Woods to his feet after he was handcuffed at which time one of the uniformed police officers placed Mrs. Woods under arrest. Although neither Mr. Woods or Mrs. Woods can specify which officer placed Mrs. Woods under arrest, both Officer Richmond and Officer Williams were wearing uniforms. Taking the facts in the light most favorable to Mrs. Woods, both officers were present at the time of her arrest and witnessed or were involved in the events giving rise to Mrs. Woods' arrest and her actual arrest. Consequently, summary judgment is denied as to Mrs. Woods' § 1983 claims against Officers Richmond and Williams because a genuine issue of material fact exists regarding whether they failed to act with a deliberate or reckless disregard of Mrs. Woods' constitutional rights.

The Harvey Police Officers also moved for summary judgment as to Mrs. Woods' claims in counts IV, V, and VI. The court denies summary judgment as to each of the Harvey Police Officers with regard to counts IV and V. As discussed above, genuine issues of material fact exist as to the existence of probable cause and the extent of each of their involvement in Mrs. Woods' arrest and imprisonment. In addition, the court denies summary judgment with regard to count VI with regard to Officer Richmond and Officer Williams. Since Mrs. Woods has not offered any evidence that she

was touched in any way by Officer Clay, however, summary judgment is granted in favor of Officer

Clay with regard to Mrs. Woods' claims in count VI.

### C.    Count VII - Malicious Prosecution

Malicious prosecution in Illinois requires "(1) the commencement or continuance of an [*sic*]

civil or criminal judicial proceeding by the defendant, (2) the termination of the proceeding in the

plaintiff's favor, (3) the absence of probable cause for the proceeding, (4) the presence of malice, and

(5) damages to the plaintiff resulting from the commencement or continuance of that proceeding."

*Rodgers* v. *Peoples Gas, Light & Coke Co.*, 733 N.E.2d 835, 840, 315 Ill. App. 3d 340, 248 Ill. Dec.

160 (Ill. App. Ct. 2000). Defendants contend that plaintiffs failed to establish a *prima facie* case of

malicious prosecution.

Defendants argue that plaintiffs cannot meet the third prong of a *prima facie* case of

malicious prosecution because they failed to establish that the charges against them were terminated

in their favor. With regard to Mr. Woods, one charge was SOL'd while the other charge was

terminated with a *nolle prosequi*. Likewise, the charge against Mrs. Woods was terminated with a

*nolle prosequi*. In determining whether proceedings are terminated favorably, the Illinois Supreme

Court follows the approach set forth in the Restatement (Second) of Torts, which provides:

> Termination in favor of the person against whom civil proceedings are brought.
> Civil proceedings may be terminated in favor of the person against whom they are
> brought *** by (1) the favorable adjudication of the claim by a competent tribunal,
> or (2) the withdrawal of the proceedings by the person bringing them, or (3) the
> dismissal of the proceedings because of his failure to prosecute them. A favorable
> adjudication may be by a judgment rendered by a court after trial, or upon demurrer
> or its equivalent. In either case the adjudication is a sufficient termination of the
> proceedings, unless an appeal is taken.
> ***

> Whether a withdrawal or an abandonment constitutes a final termination of the case in favor of the person against whom the proceedings are brought and whether the withdrawal is evidence of a lack of probable cause for their initiation, *depends upon the circumstances under which the proceedings are withdrawn.* (Emphasis added.) Restatement (Second) of Torts § 674, Comment j (1977).

*Velez* v. *Avis Rent a Car Sys.*, 721 N.E.2d 652 at 655, 308 Ill. App. 3d 923, 242 Ill. Dec. 373 (Ill. App. Ct. 1999), quoting *Cult Awareness Network* v. *Church of Scientology Int'l*, 685 N.E.2d 1347 at 1352, 177 Ill. 2d 267, 226 Ill. Dec. 604 (1997). Under this approach, dispositions that do not reach the merits of the underlying case may satisfy the favorable determination requirement depending upon the circumstances under which the disposition is obtained. *Id.* "[A] *nolle prosequi* may serve as a favorable termination unless the prosecution was abandoned for reasons not indicative of the innocence of the accused." *Id.* at 655-56, citing *Swick* v. *Liautaud,* 662 N.E.2d 1238, 1242-43, 169 Ill. 2d 504, 215 Ill. Dec. 98 (1996). Abandoned proceedings that are not indicative of a favorable termination include "when the nolle prosequi is the result of an agreement or compromise with the accused, misconduct on the part of the accused for the purpose of preventing trial, mercy requested or accepted by the accused, the institution of new criminal proceedings, or the impossibility or impracticability of bringing the accused to trial." *Id.* at 656 (citations omitted). An SOL, under certain circumstances, also may indicate a defendant's innocence sufficient to support a malicious prosecution claim. *See Cult Awareness Network,* 685 N.E.2d at 1353.

In this case, the parties dispute the precise circumstances giving rise to the termination of the charges against Mr. Woods and Mrs. Woods but both parties agree that the charges were terminated following Officer Clay's failure to appear in court. According to defendants, Officer Clay, the complaining witness, failed to appear in court as the result of an "administrative glitch" because the cases were given the wrong court dates and not scheduled on Officer Clay's court key. (Def. Mem.

at P. 19). Plaintiffs, however, argue that it was Officer Clay's duty to give the reporting officer the court dates and that Sergeant Perry ordered Officer Clay to appear in court. The orders themselves did not specify any reason for their entry.[6]

In any event, the circumstances surrounding the entry of the SOL and *nolle prosequi* orders demonstrate a genuine issue of material fact as to whether the charges were terminated in plaintiffs' favor. Officer Clay failed to appear in court, and, as a consequence, those charges were dismissed. *See Farris* v. *Messimore*, 219 Ill. App. 582, 583 (Ill. App. Ct. 1920)(dismissal for failure of witness to appear is favorable termination). *See also Velez*, 721 N.E.2d at 655 ("An involuntary dismissal resulting from a plaintiff's failure to comply with discovery serves as a favorable termination due to the fact that *a party who fails to produce evidence, in essence, fails to prosecute.*")(emphasis added).

Sergeant Perry, Officer Williams, and Officer Richmond also argue that summary judgment should be granted in their favor because only Officer Clay initiated the criminal proceedings. Under Illinois law, "[a] defendant is considered to have commenced criminal proceedings if he 'initiated a criminal proceeding or his participation [was] of so active and positive a character as to amount

---

[6]For all of their voluminous briefings, neither party addressed the effect of the distinction between the *nolle prosequi* orders and the SOL order, choosing instead to treat all of the charges as being dismissed via an SOL or a *nolle prosequi*. In a recent opinion, the Illinois Supreme Court reiterated the distinction between an SOL and a *nolle prosequi*. *See Ferguson* v. *City of Chicago*, 2004 Ill. LEXIS 1673 (Ill. Nov. 18, 2004). "A *nolle prosequi* is a formal entry of record whereby the prosecuting attorney declares that he is unwilling to prosecute the case. In contrast to an SOL order, which leaves the criminal proceedings pending, a *nolle prosequi* order terminates the charge and requires the institution of a new and separate proceeding to prosecute the defendant." 2004 Ill. LEXIS 1673 at *9-10 (internal citations omitted). Thus, one of the charges against Mr. Woods remains pending. It follows that Mr. Woods cannot establish that the SOL'd charge was terminated in his favor. Further complicating matters, the court is unable to determine which of the two charges against Mr. Woods was SOL'd, and neither party provides any clarification. Nevertheless, as the moving party, defendants failed to raise this issue. Therefore, any such argument is waived. *See Williams* v. *REP Corp.*, 302 F.3d 660, 666 (7th Cir. 2002)(*quoting Hojnacki* v. *Klein-Acosta*, 285 F.3d 544, 549 (7th Cir. 2002)("A party waives an argument that it does not raise in before the district court or, if raised in the district court, it fails to raise on appeal.").

26

to advice and cooperation." *Fabiano* v. *City of Palos Hills*, 784 N.E.2d 258 at 270, 336 Ill. App. 3d 635, 271 Ill. Dec. 40 (Ill. App. Ct. 2002), citing *Denton* v. *Allstate Ins. Co.*, 504 N.E.2d 756, 759, 152 Ill. App. 3d 578, 105 Ill. Dec. 471 (Ill. App. Ct. 1986). In Illinois, "a prosecution is commenced by a complaint, an information, or an indictment." *Mulligan* v. *Village of Bradley*, 475 N.E.2d 1029, 1032, 131 Ill. App. 3d 513, 86 Ill. Dec. 650 (Ill. App. Ct. 1985). In the present matter, plaintiffs have failed to bring forward any evidence that Sergeant Perry, Officer Williams, or Officer Richmond had any involvement in the commencement of the criminal proceedings. There is no evidence that they participated in the drafting or signing the criminal complaints, that they testified against plaintiffs, or that they had any involvement with plaintiffs or their prosecution following their arrests. Thus, the court grants summary judgment in favor of Sergeant Perry, Officer Williams, and Officer Richmond as to count VII.

### D. Count VIII – Intentional Infliction of Emotional Distress

Under Illinois law, the following elements are required to state a claim for the tort of intentional infliction of emotional distress: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress or knowledge that there is a high probability of causing severe emotional distress; (3) the conduct actually caused severe emotional distress. *Pub. Fin. Corp.* v. *Davis*, 360 N.E.2d 765, 767, 66 Ill.2d 85, 4 Ill. Dec. 652 (Ill. 1976); *Doe* v. *Calumet City*, 641 N.E.2d 498, 506, 161 Ill. 2d 374, 204 Ill. Dec. 274 (Ill. 1994). Defendants contend that plaintiffs have failed to establish a *prima facie* case of intentional infliction of emotional distress and, as a result, plaintiffs' claims should fail as a matter of law.

### 1. Extreme and Outrageous Conduct

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Pub. Fin. Corp.*, 360 N.E.2d at 767, quoting Restatement (Second) of Torts § 46, comment *d* (1965). Whether conduct is extreme and outrageous is "judged on an objective standard based on all of the facts and circumstances of a particular case." *Doe*, 641 N.E.2d at 507 (citation omitted). "Conduct is of an extreme and outrageous character where recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* (quotation omitted). Although "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are insufficient, *id.*, conduct may be characterized as extreme and outrageous where "(1) the character of the conduct itself is extreme and outrageous (2) the conduct arises out of an abuse of a position or relationship in which the defendant has authority over the plaintiff, or (3) the defendant knew of some peculiar susceptibility of the plaintiff's to emotional distress." *Rudis* v. *Nat'l College of Educ.*, 548 N.E.2d 474, 476, 191 Ill. App. 3d 1009, 139 Ill. Dec. 89 (Ill. App. Ct. 1989)); *see also Doe*, 641 N.E.2d at 507, 161 Ill.2d 374.

Defendants argue that the conduct of Sergeant Perry toward plaintiffs was not so extreme and outrageous as to sustain a claim for intentional infliction of emotional distress, citing Sergeant Perry's lack of contact with plaintiffs and his lack of involvement in their arrests. Plaintiffs do not respond to defendants' argument with regard to Sergeant Perry and, thus, have waived any argument in opposition. *See Arendt* v. *Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir. 1996)(failure to respond to arguments in response to summary judgment motion results in waiver). The court grants summary judgment as to count VIII in favor of Sergeant Perry.

Defendants also maintain that Mrs. Woods cannot state a claim of intentional infliction of emotional distress against Officers Clay, Williams, and Richmond because they were not involved in the arrest and restraint of Mrs. Woods. They further argue that the record is void of evidence that defendants knew severe emotional distress was certain or substantially certain to result from their conduct. As previously discussed in this opinion, however, a genuine issue of material fact exists regarding the roles played by Officers Clay, Williams, and Richmond in the arrest and restraint of Mrs. Woods.

Taking the evidence in the light most favorable to Mrs. Woods, she was arrested without probable cause when informing the officers arresting her husband that he was a police officer. (Pl. Resp. Facts at ¶ 16). At that time one of the defendants said in response, "Well, nigger, this ain't Chicago. You Chicago cops think you're the shit." (Pls' Resp. to City of Harvey Defs' L.R. 56.1 at ¶ 15). Mrs. Woods then said that her husband was a Chicago police officer who was merely attempting to break up a fight when she heard, "Well, this ain't Chicago, punk." *Id.* at ¶ 15. She was placed under arrest in front of a crowd. Following her arrest, she was transported to the police station and placed in a jail with a prostitute who was ranting, raving, and cussing. *Id.* at ¶¶ 22, 38, 41. The prostitute also asked Mrs. Woods, "What the f_ck are you looking at?" *Id.* at ¶¶ 22, 38, 41. These facts suggest that Officers Clay, Williams, and Richmond abused their authority as police officers and create a genuine issue of material fact as to whether Officers Clay, Williams, and Richmond intended to cause Mrs. Woods severe emotional distress or knew that their conduct was certain or substantially certain to result in Mrs. Woods' severe emotional distress.

## 2.    Severe Emotional Distress

Defendants further argue that plaintiffs failed to establish that they experienced severe emotional distress. "The emotional distress required to support the cause of action must be so severe that no reasonable person could be expected to endure it." *Adams* v. *Sussman & Herzberg, Ltd.,* 684 N.E.2d 935, 941, 292 Ill. App. 3d 30, 225 Ill. Dec. 944 (Ill. App. Ct. 1997) (citation omitted). "[T]he infliction of such emotional distress as fright, horror, grief, shame, humiliation and worry is not sufficient to give rise to a cause of action." *Id.* The purpose of the resulting severe distress element is to "prevent fictitious claims." *Doe,* 641 N.E.2d at 508. Moreover, "[t]he intensity and the duration of the distress are also factors to be considered[.]" *Pub. Fin. Corp.*, 360 N.E.2d at 767. Indeed, physical harm is not a requirement "if the conduct is sufficiently extreme and outrageous there may be liability for the emotional distress alone[.]" RESTATEMENT (SECOND) OF TORTS § 46, Comment *k*).

Plaintiffs assert that Officer Woods experienced humiliation, shame, guilt and embarrassment as a result of his arrest and detention. He also fears losing his job as a police officer and being falsely accused and has experienced sleepless nights, panic and anxiety. Mrs. Woods also has experienced anxiety and sleepless nights, as well as shame, depression, humiliation, and a damaged sense of security. Unfortunately for plaintiffs, such emotional distress, without more, does not constitute severe emotional distress. *See Adams*, 684 N.E.2d at 942 (plaintiff failed to prove severe emotional distress where he experienced a general fear and fear of losing his job and being falsely accused); *Knysak* v. *Shelter Life Ins. Co.*, 652 N.E.2d 832, 273 Ill. App. 3d 360, 210 Ill. Dec. 30 (Ill. App. Ct. 1995)(plaintiff failed to prove severe emotional distress where he testified that he was very upset, very nervous, and very depressed).

There also is no evidence of the severity of the emotional distress that plaintiffs suffered, *i.e.*, that they were hospitalized, sought and received psychiatric treatment, or even were prescribed medication. *Id. See also Farrar* v. *Bracamondes*, 332 F. Supp. 2d 1126 (N.D. Ill. 2004)("Stress, nervousness, anxiety, and sleeplessness that do not require medical treatment are not severe emotional distress."), citing *Swanson* v. *Swanson*, 257 N.E.2d 194, 196, 121 Ill. App. 182 (Ill. App. Ct. 1970), *Knierim* v. *Izzo*, 174 N.E.2d 157, 164, 22 Ill. 2d. 73 (Ill. 1961); *Knysak*, 652 N.E.2d at 840 (plaintiff failed to show requisite severity of emotional distress where there was no evidence that plaintiff was hospitalized, sought or received psychiatric treatment, or was prescribed medication). It is undisputed that Mr. Woods and Mrs. Woods did not seek medical treatment or mental health treatment for any of their emotional injuries, nor did they take or receive any medications for their emotional injuries. *See* Pls' Resp. City of Harvey Defs' L.R. 56.1 at ¶¶ 44-45. This suggests that their distress does not rise to the level of severity necessary to maintain a claim for intentional infliction of emotional distress. Accordingly, the court grants summary judgment in favor of the City of Harvey defendants on the plaintiffs' claims of intentional infliction of emotional distress.

**III.     City of Harvey's Motion for Summary Judgment**

In count II of the second amended complaint, plaintiffs seek relief against the City pursuant to § 1983. Arguing that plaintiffs have failed to produce any evidence that the alleged misconduct of the Harvey Police Officers was undertaken pursuant to a policy, custom, or practice of the City, the City has moved for summary judgment as to count II.

"Although a municipality is subject to suit under § 1983, *respondeat superior* liability will not suffice to impose § 1983 liability on the City." *Baskin* v. *City of Des Plaines*, 138 F.3d 701, 704 (7th Cir. 1998). Instead, a municipality may be held liable under § 1983 in one of three ways:

(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Baxter* v. *Vigo County Sch. Corp.*, 26 F.3d 728, 734-35 (7th Cir. 1994), citing *Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Where, as here, plaintiffs attempt to establish liability against a municipality based on the widespread practice of the municipality, "there must be an 'affirmative link' between the custom at issue (especially when the custom itself does not establish wrong-doing) and the constitutional deprivation alleged to cast blame on the City." *Jones* v. *City of Chicago*, 787 F.2d 200 at 204 (7th Cir. 1986), citing *City of Oklahoma* v. *Tuttle*, 471 U.S. 808, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985). This affirmative link requires some knowledge or awareness on the part of the municipality of both the custom and its unconstitutional consequences, "showing the municipality's approval, acquiescence, or encouragement of the alleged unconstitutional violation." *Id.* In order to hold the municipality liable for the constitutional deprivation, the evidence must permit an inference of deliberate indifference or tacit authorization of the violative conduct. *See id.* at 205.

Plaintiffs assert that citizen complaints against the City's police officers almost never result in official censure, which causes the City's police officers to believe that their actions will not be scrutinized. Plaintiffs rely upon the deposition testimony of Commander Camille Damiani ("Damiani"), the police department's former Internal Affairs commander, and the resolution of internal affairs investigations of complaints of violations of civil rights under from 1995 to 2000 in support of their § 1983 claim against the City. During this period, Damiani sustained only one of

thirty-nine civil rights-related complaints.[7] The vast majority of these civil rights complaints involved allegations of excessive force. In the four or five instances in which a person complained of false arrest, that person would be advised to go to court and to return to file a complaint with the police department after the lawsuit was resolved or the person was found not guilty. Damiani explained the rationale for advising individuals complaining of false arrest to go to court as follows: "Because that is the judge's responsibility to make that determination. Officers aren't going to change their story when they come into my office. It is always your word against their word, so you go to court. If the judge finds you not guilty, come on back and file a complaint. They don't ever come back." (Pls' Amended Resp. to City of Harvey Defs' L.R. 56.1, Ex. N at 49-50). Only one individual filed a complaint after proceeding with a lawsuit, and the City investigated his complaint.

Plaintiffs maintain that Damiani also chose not to memorialize oral complaints into written complaints between ten and fifty times and chose not to turn approximately ten citizen complaints into case reports.[8] Damiani never had the occasion to take a complaint of false arrest or malicious prosecution; however, the police department always took complaints of excessive force and conducted investigations. While commander of Internal Affairs, Damiani recommended the termination of two police officers, one in a matter involving rape and the other in a matter involving

---

[7]The City resolved citizen complaints by categorizing its findings as follows: "Unfounded (meaning the allegations giving rise to the complaint never happened); Not sustained (meaning that the complaint could not be proven); Exonerated (meaning the officer had legal justification); and Sustained (meaning the complainant is right and there is enough proof to state the officer was wrong)." (Pls' Amended Resp. to City of Harvey Defs' L.R. 56.1 at 21-22). The City only punished its police officers for sustained complaints.

[8]According to Damiani's deposition testimony, these complaints involved allegations that could not be proven one way or the other. For example, Damiani would not memorialize an oral complaint into a written complaint if the complainant claimed that he unfairly received a speeding ticket or parking ticket. On those occasions, Damiani would advise the complainant to contest the ticket in court.

theft. Damiani never recommended the termination of a police officer for claims of false arrest, battery, false imprisonment, or malicious prosecution.

Plaintiffs also note Damiani's lack of training in Internal Affairs. Damiani was selected to become an Internal Affairs investigator after working as a patrol officer for three and a half years. She did not receive any formal training for this position. She worked as an Internal Affairs investigator for three years, transferred out for a year, and then took over as commander of the Internal Affairs department. Damiani's training involved a one or two-day course on investigations. There were no specific requirements for becoming commander of Internal Affairs, and there was no manual for Internal Affairs. Although she received on-the-job training in carrying out her duties, Damiani never received formal training on terminating employees.

The City's Chief of Police, Phillip Hardiman ("Hardiman"), also took complaints directly from citizens on approximately twenty to twenty-five occasions. If a general complaint was made with a request to speak with the police officer, Hardiman was unlikely to report the incident to Internal Affairs or file a written report; instead, he would speak with the police officer directly.[9] Out of forty-three citizen complaints of police misconduct, the City disciplined two officers for civil rights violations, and Hardiman concurred with all of the conclusions that did not sustain civil rights complaints against the police officers. In addition, the police department did not require investigators to advise their Internal Affairs commander when they decided against transcribing oral complaints into written complaints. There was also no written policy regarding which complaints

---

[9]The plaintiff did not provide any evidence regarding the nature of the general complaints made to Hardiman, *i.e.*, whether they involved allegations of civil rights violations.

must be transcribed. Plaintiffs further point to the rehiring of Officer McGee[10] by the City after he was terminated for destroying evidence and the promotion of Officer Williams to detective after he was reprimanded or suspended at least eight times as evidence that the City does not act to punish its police officers. Officer Williams is currently a defendant in another lawsuit in which the plaintiff alleged false arrest. No complaint has been filed with the Internal Affairs department regarding the lawsuit, and the Internal Affairs department has not conducted a formal investigation into the allegations of that lawsuit.

Essentially, plaintiffs are asking the court to infer that the City improperly investigated and resolved the forty-three citizen complaints because only two complaints were sustained, and, therefore, the City's police officers believe that their actions will not be scrutinized. At this late stage, however, plaintiffs have not provided any evidence that more of the complaints should have resulted in the censure of police officers or that the City failed to adequately investigate complaints of false arrest, battery, false imprisonment, or malicious prosecution. Plaintiffs also failed to provide evidence concerning the nature or circumstances of the civil rights violations alleged in the forty-three complaints.[11]

---

[10]Officer McGee also was accused of rape while serving as a police officer for the City. He received a 30-day suspension.

[11]In a previous matter brought before this court against the City, the court reviewed the factual record regarding the City's failure to investigate excessive force complaints and determined that a question of material fact existed as to whether the City had an official policy that deprived the plaintiff of his constitutionally protected right to be free from the police officer's use of excessive force. *See Robinson* v. *City of Harvey, et al.*, 2001 U.S. Dist. LEXIS 1930, 2001 WL 138901 (N.D. Ill. Feb. 16, 2001). In that case, "the record revealed that decisions of whether to investigate excessive force complaints are often unreviewed and undocumented, and no written guidelines exist for handling such complaints." 2001 U.S. Dist. LEXIS 1930 at *23-24. In addition, the plaintiff submitted evidence that 24 investigations of excessive force complaints between 1995-1997resulted in no discipline. 2001U.S. Dist. LEXIS 1930 at *24. The plaintiff also submitted an expert report concluding that the Harvey Police Department

(continued...)

In construing the evidence submitted by plaintiffs as an attempt to show that the City ignored or improperly disposed of complaints involving its police officers, plaintiffs failed to establish an issue of material fact. By itself, the fact that the City did not sustain more citizen complaints against its police officers does not establish a widespread custom of ignoring or improperly disposing of complaints, and plaintiffs have not shown that the City should have punished more police officers or that it ignored complaints involving batteries, false arrests, or false imprisonments. *See Bryant v. Whalen,*759 F. Supp. 410, 412 (N.D. Ill. 1991)("The fact that a low percentage of cases are ultimately sustained cannot in and [of] itself be read to establish a policy of indifference.").

The court is certainly troubled by the lack of training and experience of Damiani and presumably other members of the City's Internal Affairs department, the lack of written guidelines for investigating citizen complaints, and the failure of the City to document all complaints made against its police officers. Plaintiffs, however, must offer "further evidence tending to show that meritorious claims were either being deliberately ignored or perfunctorily dismissed." *Id. See also Vukadinovich* v. *Zentz*, 995 F.2d 750 at 755 (7th Cir. 1993)(citing *Bryant* with approval). Such evidence may have included expert testimony demonstrating contemporary standards for procedures

---

[11](...continued)

has systemic deficiencies in its administrative investigations of use of force and citizens' complaints alleging improper use of force. These systemic deficiencies were so pervasive and pretextual that any reasonable officer in such a police agency would be aware of the significant failures of these critical administrative investigations and would feel comfortable that field misconduct, particularly use of unreasonable force, would not be discovered, would be minimized or would not result in any significant sanction. These systemic failures by the Harvey Police Department appeared to be conscious departures from generally accepted practices within law enforcement.

*Id.* In the present matter, by contrast, plaintiffs rely exclusively upon the deposition testimony of Damiani and Hardiman regarding the handling of complaints. Their undisputed deposition testimony established that while the City did not have a written policy for the handling of excessive force complaints, the City investigated every complaint of excessive force, including videotaping both the complainant and the police officer.

to handle citizen complaints, what could be an expected number of meritorious complaints under proper procedures, or some actual evidence that complaints lodged in the City of Harvey were meritorious. *See, e.g., Robinson*, 2001 U.S. Dist. LEXIS 1930 *at *24. See also Sledd* v. *Lindsay*, 102 F.3d 282 at 287 (7th Cir. 1996)(defendant city's motion to dismiss denied where plaintiff's complaint contained statistical allegations involving the number of complaints filed with the police department, the number of investigations conducted, and the estimated percentage of complaints with merit, as well as detailed allegations concerning the police officers' "code of silence"). Without any such evidence no basis exists for a finding that City's policy caused plaintiff's injury. Thus, the court grants summary judgment in favor of the City as to count II of the second amended complaint.

## IV. The Fifty Yard Line's Motion for Summary Judgment

The Fifty Yard Line moved for summary judgment as to plaintiffs' § 1983 claims in count III, arguing that there is no evidence of joint action between the City and the Fifty Yard Line and that there is no evidence that an official policy of the Fifty Yard Line caused the alleged deprivation of plaintiff's federal rights.

It is not necessary that a defendant be an officer of the State in order to be held liable under § 1983. *Dennis* v. *Sparks*, 449 U.S. 24, 27, 66 L.Ed. 2d 185, 101 S. Ct. 183 (1980). Instead, "[i]t is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions." *Id.* at 27-28, citing *Adickes* v. *S. H. Kress & Co.*, 398 U.S. 144, 152 (1970); *United States* v. *Price*, 383 U.S. 787, 794 (1966).

It is undisputed that the Fifty Yard Line hired Officer Clay, Officer McGee, and Deputy Marshall Jones to work security at the Fifty Yard Line as a result of word of mouth that employment was available. It is also undisputed that the Fifty Yard Line, not the City, paid Officer Clay, Officer McGee, and Deputy Marshall Jones to work security. The parties also do not dispute that Officer Clay, Officer McGee, and Deputy Marshall Jones wore black "tactical" outfits, carried their City-issued service weapons, and wore their police badges. In addition, the Fifty Yard Line's management instructed the police officers acting as security personnel that they were to work the hallway and check for weapons and identification. (Pls' Resp. to Fifty Yard Line's L.R. 56.1, Ex. F at 20-21). Essentially, the Fifty Yard Line employed Officer Clay, Officer McGee, and Deputy Marshall Jones to function as police officers and to demonstrate to its patrons by virtue of the outfits, weapons, and badges worn by the officers and deputy marshall that the officers were protecting the premises and its patrons.

The present matter is similar to the situation presented in *Groom* v. *Safeway, Inc.*, 973 F. Supp. 987 (W.D. Wash. 1997). In *Groom,* the plaintiff brought a § 1983 action after an off-duty police officer who worked as a security guard for Safeway detained and handcuffed her on the belief that she was shoplifting after being notified by a store manager that the plaintiff might have been attempting to shoplift. *Id.* at 989. While working as a security guard, the off-duty police officer wore his Seattle Police Department uniform, he was armed, and Safeway was paying him for his time. *Id.* Following a jury trial in which the jury found Safeway liable under § 1983, the court affirmed its earlier decision that Safeway acted under color of state law. The court explained:

> In the instant case, Safeway did more than cloak itself with the authority of the state: it hired an instrument of the state's power. Officer Hori, his uniform, his badge, and his gun were all hired to serve Safeway's goal of deterring theft in its

stores. Although Hori acted in his capacity as a police officer, he did so on Safeway's time. . . .Thus, the employment relationship gives the private entity and the state agent an overlapping identity and interest and sufficiently involves the state in the relevant actions of the private entity to bring those actions under color of state law.

*Id.* at 991. Nevertheless, the court specified that is was not holding Safeway automatically liable for every action that the off-duty police officer took. *Id.* at 992. As a result, it was possible that the off-duty police officer's actions resulted in a deprivation of the plaintiff's civil rights while Safeway's actions did not. *Id.* The court merely held that "whatever Safeway did, it did under state law."

The present case, like *Groom,* is distinguishable from the cases cited by the Fifty Yard Line. In *Profitt* v. *Ridgeway,* 279 F.3d 503, 508 (7th Cir. 2002), the Seventh Circuit held that a private citizen did not act as a state actor in assisting a police officer in subduing the decedent because the private citizen did not cross the line of becoming a temporary police officer. Similarly, a conservation warden, whose position consisted of enforcing game laws and not the general enforcement of state law, did not become a state actor when complaining of alleged criminal acts to deputy sheriffs. *See Hughes* v. *Meyer,* 880 F.2d 967, 972 (7th Cir. 1989). Further, private security guards employed by a department store were not state actors under § 1983 where there was no evidence of a pre-existing plan between the police and store officials. *See Davis* v. *Carson Pirie Scott & Co.,* 530 F. Supp. 799 (N.D. Ill. 1982). None of these cases cited by the Fifty Yard Line involved police officers who, while working for a private entity, cloaked themselves with the authority of their position as police officers and acted in accordance with that authority. Nor do these cases involve a private entity employing police officers to act in accordance with their police functions for the benefit of the private entity.

The Fifty Yard Line also relies upon *Otani* v. *City & Cty. of Hawaii*, 126 F. Supp. 2d 1299 (D. Haw. 1998) in support of its argument that the Fifty Yard Line was not acting under color of law. In *Otani*, the plaintiff claimed that he was assaulted twice and then arrested by an off-duty police officer who was employed by a private company to direct traffic at its construction site. *Id.* at 1302. The court granted summary judgment in favor of the company on the plaintiff's § 1983 claim, finding that the plaintiff had presented no evidence that suggested that the company was acting in concert with the police officer when the police officer arrested the plaintiff. *Id.* at 1306. Although the plaintiff described how the company supervised and controlled the police officer's actions with respect to his direction of traffic at the construction site, the company never instructed the police officer as to how to perform his job of directing traffic or when or how to arrest people who interfered with his direction of traffic. *Id.* In addition, the company in *Otani* was required by its contract with the state to hire a police officer to direct traffic at its construction site. *Id.*

Unlike the situation presented in *Otani*, the Fifty Yard Line hired Officer Clay, Officer McGee, and Deputy Marshall Jones to police its premises and ensure the safety of its patrons and staff. The fact that the Fifty Yard Line employed both police officers and non-police security personnel demonstrates an awareness on the part of the Fifty Yard Line that the police officers possessed a different level of authority and professional training than its non-police security personnel. Accordingly, the court finds that the Fifty Yard Line was acting under color of law by virtue of its employment of the police officers as part of its security force.

A finding that the Fifty Yard Line acted under color of law, however, is not sufficient to hold the Fifty Yard Line liable under § 1983. The plaintiffs must also offer evidence that the Fifty Yard Line caused the deprivation of their constitutional rights through one of its official policies or

practices. *See Rodriguez* v. *Smithfield Packing Co., Inc.*, 338 F.3d 348 at 355 (4th Cir. 2003)("private corporations can only be held liable under § 1983 if an official policy or custom of the corporation causes the alleged deprivation of federal rights")(internal quotations omitted).

In *Rodriguez*, the Fourth Circuit held that the district court erred by denying the defendant-private company's motion for judgment as a matter of law on the plaintiff's § 1983 claim. *Rodriguez*, 338 F.3d at 356. An auxiliary deputy sheriff was chief of security at the private company's plant. *Id.* at 351. The auxiliary deputy sheriff was not on the payroll of the sheriff's department but was nonetheless charged by the sheriff with handling many law enforcement functions at the plant, including criminal investigations and the service of civil papers and criminal warrants. *Id.* Following an unsuccessful union election, a fight broke out at the company's plant. The auxiliary deputy sheriff pepper sprayed one plaintiff, kneed him in the back, handcuffed him, and arrested him. *Id.* at 352. A sheriff's deputy handcuffed and arrested another plaintiff. *Id.* Both plaintiffs were taken to jail on a series of misdemeanor charges at the direction of the auxiliary deputy sheriff. *Id.* The plaintiffs argued that the auxiliary sheriff's deputy, as chief of security for the plant, was the final policymaker for the company with respect to all arrests an investigations at the plant. *Id.* at 356. Therefore, the plaintiffs contended, the decision of the auxiliary sheriff's deputy to arrest the plaintiffs should be imputed to the company for the purpose of § 1983 liability. *Id.*

The Fourth Circuit, however, disagreed with this contention, explaining that the plaintiffs ignored the fact that the company could not have delegated any policymaking authority to the auxiliary deputy sheriff because the company lacked authority over county law enforcement policies. *Id.* Instead, because the arrest of [the plaintiffs] was explicitly executed under [the auxiliary deputy

41

sheriff's] authority as a sheriff's deputy seeking to enforce North Carolina state law, it was a decision which flowed from the authority delegated to the [auxiliary deputy sheriff] by the County Sheriff." *Id.* The Fourth Circuit further explained, "When a security guard is acting as a sheriff's deputy exercising the quintessential state function of arrest . . . the assumption is that state policies and state training would be guiding the exercise of that authority, at least in the absence of evidence that the private entity sought to supplant state policies or training procedures with policies of its own." *Id.*

Here, the parties dispute whether the Fifty Yard Line had a security policy and whether the Fifty Yard Line trained the police officers who worked security at the Fifty Yard Line. The deposition testimony of Zach Blasingame established that the Fifty Yard Line had an unwritten security policy that its security guards were not supposed to put their hands on patrons who were causing problems but were instead supposed to ask such patrons to leave. (Fifty Yard Line's L.R. 56.1, Ex. E at 28-30). Blasingame discussed this policy in the context of the other security personnel employed by the Fifty Yard Line, not the police officers. The Fifty Yard Line also argues that plaintiffs submitted no evidence of a policy of the Fifty Yard Line to effectuate improper arrests. Plaintiffs, however, argue that the Fifty Yard Line caused the deprivation of their constitutional rights by maintaining a policy of hiring police officers to work security, by instructing the police officers as to how to perform their duties, by failing to have safety precautions in place, and by failing to have a written security policy. In addition, rather than reporting to the police department as in *Rodriguez*, the officers reported to the Fifty Yard Line's management while working security. This is sufficient to raise a genuine issue of material fact as to whether the Fifty Yard Line attempted to supplant the training and policies of the City with its own security policies. *See Groom*, 973 F. Supp. at 992 ("Plaintiff's only argument was that Safeway caused her to be subjected to a deprivation

of her constitutional rights through its hiring and training policies, or lack thereof, and Plaintiff presented evidence based on which the jury could have agreed."). Thus, the court denies summary judgment as to the plaintiffs § 1983 claim against the Fifty Yard Line.

## V.    Count IX - Violation of the Illinois Constitution

In count IX of the second amended complaint, plaintiffs assert that the actions of the defendants violated their rights under Article I of the Illinois Constitution. The City and the Harvey Police Officers make no argument specific to this count other than to refer the court to their previous arguments. Based on the court's own independent research, it would appear that the plaintiffs may not maintain a separate, independent cause of action under the Illinois Constitution for battery, false arrest, excessive force, or malicious prosecution. *See, e.g., Ingram* v. *Jones*, 1995 U.S. Dist. LEXIS 18412, 1995 WL 745849, *4 (N.D. Ill. Nov. 29, 1995)("because Illinois common law provides Plaintiff the remedy of actions for false arrest and excessive force, this Court finds that an Illinois court considering the issue would not recognize a right to bring a separate cause of action under Article I, § 6 of the Illinois Constitution."); *Doe* v. *V. of T.*, 2003 U.S. Dist. LEXIS 17570 (N.D. Ill. Sep. 30, 2003)(no cause of action for alleged constitutional where plaintiff has access to adequate remedies under state common law or federal law); *Tidwell* v. *Teneyuque*, 2001 U.S. Dist. LEXIS 3758, 2001 WL 321052, at *3 (N.D. Ill. Mar. 30, 2001)(no cause of action existed under the Illinois Constitution for plaintiff's claims of assault, battery, or false imprisonment because adequate remedies existed under state common law and federal law, specifically through § 1983). Defendants, however, failed to make this or any other argument with regard to count IX and, therefore, waive any such arguments. *See, e.g., Williams* v. *REP Corp.*, 302 F.3d 660, 666 (7th Cir. 2002)(party waives an argument that it fails to develop). Thus, the court denies summary judgment as to count IX.

## ORDER

For the reasons set forth above, Plaintiff Toi Woods' Motion for Partial Summary Judgment is denied. The City of Harvey Defendants' Motion for Partial Summary Judgment is granted with regard to count II as to the City of Harvey; count IV, count V, count VI, and VIII as to Sergeant Perry; Toi Woods' claims in count VI as to Officer Clay; count VII as to Sergeant Perry, Officer Williams, and Officer Richmond; count VIII as to Sergeant Perry, Officers Clay, Williams, Richmond, and the City of Harvey. The court denies the City of Harvey Defendant's Motion for Partial Summary Judgment as to count I; counts IV, and V as to Officers Clay, Williams, and Richmond; count VI as to Officers Richmond and Williams; and count IX. The court also denies the Fifty Yard Line's Motion for Summary Judgment as to count III.

Enter:

JOAN HUMPHREY LEFKOW
United States District Judge

Date: January 10, 2005